Filed 7/31/13  Shelley J. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHELLEY J., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF ORANGE COUNTY, <br><br> Respondent; <br><br> ORANGE COUNTY SOCIAL SERVICES AGENCY et al., <br><br> Real Parties in Interest. | G048334 <br><br> (Super. Ct. No. DP020205) <br><br> O P I N I O N |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Gary Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Petition denied.

Law office of Rebecca N. Captain and Lawrence A. Aufill for Petitioner.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Parties in Interest.

Law Office of Harold LaFlamme and Karen S. Cianfrani for the minor.

*    *    *

Shelley J. (Grandmother), the biological maternal grandmother of David W. (David), seeks relief from the juvenile court order removing David from her care pursuant to Welfare and Institutions Code section 366.26, subdivision (n).[1]  We conclude the court did not abuse its discretion in finding that removing David from Grandmother's care was in David's best interest.  We deny the petition.

I

In July 2010, then four-month-old David was detained in Riverside County after his mother, Sarah W. (Mother) left him with inappropriate caretakers and could not provide care herself.  Mother also reported she was diagnosed with Asperger's/autism, Attention Deficit Hyperactivity Disorder (ADHD), depression, and anxiety.   She recalled taking medications for her psychological issues for the majority of her life.  She also admitted recently physically fighting with Grandmother over issues with David, and she had been arrested for assault.

Mother was living in Orange County with Grandmother after David was born.  They cared for David the first three months of his life.  Mother reported she then placed David with a family friend because Grandmother's health was deteriorating and Grandmother was getting a divorce.

Grandmother asserted she was David's primary caregiver before Mother took him to Riverside.  Grandmother agreed the caregivers in Riverside were inappropriate because they did not feed or interact with him properly.  Grandmother also

---

[1]      All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

opined Mother should not care for David because she was immature and had several mental health issues. Grandmother explained Mother often would not wake up at night to feed David. Grandmother claimed she had a back injury that prevented her from picking up David or caring for him. She was paralyzed by her back injury, and although she recently became able to walk, she would not be able to care for David as he grew larger. Grandmother told the social worker David should be adopted by a "'good Christian family'" but not by homosexuals.

David was placed in a foster home, where Mother and Grandmother consistently visited him. In August 2010, the court sustained the petition and declared David a dependent of the court, removing him from parental custody. The case was transferred to Orange County.

Mother received approximately 21 months of reunification services (from August 2010 to May 2012), which we will briefly summarize, including only facts relevant to the issues raised by the writ petition. During the dependency proceedings, David was transferred between five different foster homes for reasons unrelated to him. He adjusted well and was reportedly healthy, happy, and developmentally on target. During this time, Mother and Grandmother consistently visited two or three times week. Visits went well, although Mother needed a lot of assistance from Grandmother.

In November 2010, the social worker reported on the court-ordered Evidence Code section 730 evaluation. The psychologist concluded Mother had poor judgment and severely impaired insight. He opined Mother was psychiatrically very unstable and she was a substance abuser. She also was suffering from Asperger's Syndrome, ADHD, and a mood disorder. The report stated Mother's use of drugs interfered with her psychiatric treatment and was making her condition worse. The report concluded Mother "is a risk factor to the child and needs to be supervised during [visits with David]."

3

In January 2011, Mother physically assaulted Grandmother. In February 2011, Mother was placed in a psychiatric hospital. The social worker reported Mother "often displays aggressive behaviors and verbally attacks [the social worker] and other parties involved in providing [her] services." The Orange County Social Services Agency (SSA) recommend the court terminate reunification services.

After several months, Mother's condition improved and in August 2011, SSA changed its recommendation, stating mother should receive an additional six months of reunification services and the court should schedule an 18 month review hearing. In February 2012, David was released to Mother on a trial visit. It was reported then one-year-old David was a friendly and outgoing child, but he had some speech concerns and at times slurred his words. David's foster mother had taught David sign language, which he liked to use to communicate his needs.

All did not proceed as planned. The child was placed with Mother on February 1, 2012, at Heritage House, and eight days later she appeared disheveled and overwhelmed. Mother admitted she was struggling. On March 1, 2012, the social worker scheduled a visit and learned from Mother's case manager that Mother was unable to care for David. Mother often left the child unsupervised for long periods of time, and she did not know what to do when the child cried. One time, it took Mother 45 minutes to realize David was hungry, despite the fact he used sign language, pointed to his cup, and tried to open the refrigerator to get food. Mother would put two diapers on David so that she would not have to change him as often. She was too busy for three days to give him a bath. Mother admitted these things happened but claimed she was just overwhelmed. She stated, "'I know that I can't do this, I just don't want to leave him, he makes me want to stay clean and if I lose him, I don't know what I would do.'"

On March 6, 2012, David was returned to his prior foster home. When the foster mother arrived, David got very excited and started smiling and laughing. After David learned Mother had left the room, he played with the foster mother's daughter and

4

then ran to the foster mother and hugged her. He held the foster mother for approximately 20 seconds and was happy leaving in the car with her.

In April 2012, SSA filed a report recommending termination of reunification services. The social worker observed Grandmother "is admittedly unable to provide long term care for both . . . [Mother] and the child and can't be considered for a long term plan. The undersigned is currently looking toward the maternal aunt for long term placement, a plan [Mother] currently supports." The following month, the social worker reported Grandmother was now willing to adopt David if the maternal aunt was unable to adopt him.

On May 1, 2012, the court terminated Mother's reunification services and set a permanency hearing pursuant to section 366.26 (.26 hearing). Mother continued to have twice weekly visits with David, monitored by Grandmother.

The social worker soon determined placement with the maternal aunt would not be in David's best interests. The social worker opined that due to his multiple placement changes, it would not be in two-year-old David's best interests to be moved a long distance away with someone who is a stranger to him.

In the August 28, 2012, report prepared for the .26 hearing, the social worker, Deanna Petersen, stated Grandmother and David had a positive and warm relationship and he was placed in her home on July 18, 2012. Peterson noted Grandmother had been a part of David's life since his birth and had participated in every visit during the dependency proceedings. She noted Grandmother appeared very committed to providing David a permanent home. Peterson identified Grandmother as the prospective adoptive parent and said Grandmother had been informed there would be an adoptive home study. Thus, Grandmother received a home study referral requesting several documents in August 2012.

In her report, Peterson acknowledged Grandmother had many medical issues. In the late 1980s, she broke her back, requiring surgery. A couple of years later, she was diagnosed with Cauda Equina Syndrome, a painful compression of the spinal cord nerves. After surgery, her prognosis was good, but she was unable to walk and received disability. Peterson stated Grandmother's condition did not impair her ability to care for David. Her housing, income, and level of health were reported to be stable. Peterson did not mention any issues with Grandmother's mental health in her report. Based on the information she had gathered, Peterson concluded David was extremely bonded to Grandmother, who was committed to providing David with a "safe stable home. The maternal grandmother appears capable of setting appropriate boundaries with [Mother] in regard to visitation and appears to place the child's needs above those of the mother."

At the .26 hearing, the court terminated parental rights. A new caseworker, Tina Ortega, was assigned to the case. In November 2012, Ortega requested Grandmother be appointed de facto parent status and be provided an attorney to assist with the adoption finalization process.

In her November 2012 report, Ortega stated a referral to conduct a home study for Grandmother was made on August 8, 2012, and transferred to Adoption Applicant Social Worker Debra Martin on August 20, 2012, who sent Grandmother an application to adopt on October 21. Martin reported Grandmother's level of cooperation had been "fair" but the following "documents/activities" were still needed to complete the home study process: (1) two personal references; (2) a physician's medical report; (3) a declaration of income; and (4) a divorce and birth certificate. Grandmother failed to attend her Live Scan appointment and Martin made a second referral for September 18, 2012.

In November 2012, Martin conducted a home visit and interviewed Grandmother. Martin advised Grandmother about necessary documents that needed to be submitted for the home study. On November 28, 2012, the court granted Grandmother de facto parent and prospective adoptive parent standing.

Three months passed, and at the end of February 2013, Ortega reported David was a bright and active boy. Ortega reported Grandmother was providing David with a loving and nurturing environment. She was very attentive to David's needs and took him to all his appointments. David was currently being evaluated for a mild delay in fine motor skills and a moderate delay in speech. Ortega stated Grandmother was still working on the adoption home study and predicted it would be completed by April 1, 2013, if Grandmother continued to cooperate.

Martin reported Grandmother's level of cooperation had been "fair." Grandmother had not yet provided the documents listed in Ortega's November report and there were now three new requirements. On December 18, 2012, Martin requested Grandmother's roommate, Thea C., undergo a Live Scan. On January 8, 2013, Martin left Grandmother a message asking for an appointment to interview her roommate or a telephone number to contact her. Martin also reminded Grandmother of the outstanding documents needed to complete her home study. In January 2013, Martin also sent a medical report for Grandmother to give to her roommate to complete and requested the roommate take a TB test.

The following month (March 28, 2013), Ortega reported David had been referred to the school district for special education assessment and possible services. Martin now rated Grandmother's level of cooperation as "poor." Other than supplying a declaration of income, Grandmother had not supplied any of the required documents for the home study process.

7

The social workers had repeatedly asked for documentation. On March 11, 2013, Martin mailed a second physician's medical report for Grandmother to give to Thea. On March 13, Martin mailed another medical report after Grandmother submitted an incorrect and incomplete form for herself. On March 14, Martin called Grandmother and requested that she complete a new physician's form and provide Thea's telephone number and Grandmother's personal references. Martin also informed Thea that she needed a physical, a TB test, and to schedule an interview. On March 18, Martin submitted a second referral for Thea to Live Scan. Martin anticipated the home study would be completed by May 1, 2013, if Grandmother cooperated with the remainder of the study process.

Matters did not improve over the next month. On April 4, 2013, Ortega filed a report stating Martin still rated Grandmother's "level of participation" as "poor." Martin had received several documents on April 1, but she was still waiting to receive one personal reference and the Live Scan results for Thea. On March 25, Martin conducted a home visit and interviewed Thea. She was introduced to Thea's "'service dog'" a cocker spaniel who Thea stated "'helps introduce me to people because I have anxiety, which causes me to pick at myself.'" Martin observed Thea to have visible open sores on her body.

During the interview, Martin learned Grandmother met Thea in September 2012, when Thea was living at a shelter where Mother was living. Thea stated she was "'kicked out of the shelter'" due to having chronic pain and repeatedly calling for ambulances to transport her to the hospital, which was billed to the shelter. Thea stated the shelter's manager believed she was calling ambulances too frequently and was concerned about the level of care required to handle her symptoms of pain and MRSA. MRSA, or Methicillin-resistant Staphylococcus aureus infection, is caused by antibiotic-resistant staph bacteria. (<http://www.mayoclinic.org/mrsa/> (as of July 24, 2013.)

8

When Grandmother learned about Thea's fate in November 2012, she asked if Thea wanted to live with her and David. Grandmother did not ask SSA if this was appropriate. Ortega stated that when she discovered Thea was a roommate, a Relative Assessment Unit worker was sent out to the home to observe the living arrangements and clear Thea.

In Grandmother's one-bedroom apartment, Thea was sleeping on a small mattress on the living room floor. Her belongings were on the floor surrounding the mattress. Thea reported she was a disabled veteran and was diagnosed with multiple psychiatric and medical disorders including, but not limited to, a recurrent MRSA infection. She also had nightmares and chronic back and leg pain. Martin verified the reported ailments in Thea's physician's report, received a few days earlier (on April 1, 2013). In that report, Dr. Jenny Lee opined Thea was "'physically okay'" but her mental status "'need[ed] to be cleared by [a] psychiatrist. Patient with symptoms, but not a danger to others.'" Thea reported she was prescribed several medications to treat her various symptoms and took them out of her purse. Martin noted the medications were not being locked up and were easily accessible to David.

Thea told Martin she could not work due to mental health issues and she received veteran's insurance benefits and disability and food stamps. She paid Grandmother $500 rent and used her food stamps to buy groceries. She voluntarily relinquished her son in 2012 because she did not feel financially or emotionally equipped to raise a child alone.

On the same day Martin interviewed Thea, she met with Grandmother to discuss the documents still required for the home study. Three days later, Thea left a message stating she had lost the Live Scan form. Martin also received a personal reference from Grandmother's sister that was not favorable to Grandmother. The reference expressed concerns about Grandmother's ability to care for a young child, explaining Grandmother had "'good days and bad days.'"

9

Martin reported her concerns about Grandmother and Thea to Ortega on March 28, 2013. Martin told Ortega that one of Thea's disorders caused her to pick at her skin, creating open sores. Martin worried these open sores could transmit Thea's MRSA to David. In addition, David was vulnerable to catching MRSA because he played with her dog and near Thea's bedding in the living room. Martin showed Ortega an e-mail dated April 1, 2013, from the Adoptions Public Health Nurse, stating, "'Please, just be aware there is not a non-contagious form of MRSA. This condition is highly contagious, and some strains are multi drug resistant. Children are in the high risk category including those in David's age group as they often have minor cuts, skin abrasions, scrapes from normal developmental play. MRSA can invade non intact skin, in addition to mucous membranes, respiratory tract, urogenital tract etc. I read on the last status review report that in January David had a rash, which might have been caused by a bath product. Please keep an eye on this for recurrence. Even in the best of settings there is a risk for MRSA transmission. Encourage the caretakers to really go the extra mile and keep the hygiene levels high and lesions covered.'"

Martin expressed concern to Ortega that Grandmother, during the adoption process, had allowed a virtual stranger, having a lengthy mental health history and an extremely contagious recurrent infection, to move in with her. Martin observed the nature of Grandmother's relationship with Thea was unclear, but it appeared they were sharing the responsibilities of providing daily care for David. Martin stated this contradicts Grandmother's claim she was capable of caring for David on her own and Martin was now uncertain if Grandmother could care for David on her own.

At the end of March, Ortega's supervisor, Jeff Barton, contacted Grandmother and confirmed she had received and understood the need to lock up medicine and take precautions regarding Thea's MRSA and open sores. He discussed in detail the Centers for Disease Control's (CDC) recommendations regarding prevention of spreading the disease. On March 31, 2013, Thea participated in the Live Scan.

10

In her April 4, 2013 report, Ortega noted Grandmother had provided a medical report on April 1.  The physician clarified he prescribed her opiates, muscle relaxers, and allergy medications, but not her psychotropic medications.  When Ortega asked for the psychiatrist's name, Grandmother said she could not remember it.  Ortega stated that based on the family's poor level of cooperation, it was unclear whether the home study would be approved.

At the adoption review hearing held on April 4, 2013, the court stated that based on its review of Ortega's and Martin's reports, its tentative ruling was to remove David from Grandmother's home, pending further investigation.  Grandmother's counsel opposed removal of the child, arguing it would be traumatic for David, and the social workers involved with the family had not removed the child.  Minor's counsel agreed with the court's tentative, stating that based on the information in the report, Grandmother had used extremely poor judgment by allowing a roommate with psychiatric issues and contagious ailments.  SSA made no comment, stating "submitted." The court ordered David removed pending further investigation.  Three-year-old David was placed in a foster home, who was also a prospective adoptive parent.

Grandmother as de facto parent, filed an objection to David's removal pursuant to section 366.26, subdivision (n).  On April 15 and 16, the court held a contested hearing and considered testimony from the following witnesses:

A.  *Social Worker Ortega's Testimony*

Ortega testified she has been a social worker for 14 years.  She believed the adoption home study would not be approved because Grandmother showed poor judgment in allowing Thea to move in despite her medical and mental health issues, the lack of information on Grandmother's psychiatric issues, and the negative personal reference from Grandmother's sister.

11

Ortega testified she scheduled and conducted nine monthly home visits between September 2012 and April 2013. Thea was present at approximately four of those scheduled appointments. Ortega did not have any concerns about the care David received and his removal was due primarily to Martin's concerns. Ortega thought Grandmother was providing a loving home and a nurturing environment, was following up on medical and developmental therapy appointments, and was providing for all David's needs. There had been one visit after David's removal, and he was happy to see Grandmother. They played together and at the end of the visit the foster mother reported David was "wimpering."

Ortega testified she first learned Thea was Grandmother's roommate in December 2012. She noted Grandmother had not received prior approval to have a roommate, and Ortega was concerned about her presence after Thea disclosed she had been diagnosed with posttraumatic stress disorder (PTSD), and she had relinquished her own child for adoption.

During her visits to the home, Ortega did not observe Thea parenting David other than to redirect his attention a few times, such as telling him not to do something. In January 2013, Thea did a Live Scan and was initially approved to reside in the home. Additional concerns about Thea came to light in March 2013 after Martin interviewed Thea. Ortega claimed she did not see Thea's open sores.

As stated in her report, Ortega confirmed Grandmother's efforts towards adoption were minimal. Ortega testified she mailed the initial home study packet to Grandmother in August 2012. For eight months (from September 2012 to March 2013), Grandmother did not provide the required documents. Ortega recalled she discussed the outstanding items with Grandmother at every other monthly home visit. On April 1, Ortega finally was given some of the items, but Grandmother had not yet disclosed her treating psychiatrist.

12

Ortega stated Grandmother's sister gave a negative personal reference. The sister stated Grandmother on some days was in a daze or "'out of it.'" On cross-examination, Ortega stated Grandmother previously did not want David placed with her because she was having back problems and was taking a lot of medication. She believed Grandmother was still being treated for back problems, and she was taking medications, including muscle relaxers, oxycodone, and opiates.

Ortega also testified Mother was authorized to visit David, having Grandmother as the monitor. Ortega did not believe Mother posed any risk to David.

The court asked Ortega if SSA was going to approve an adoption home study. Ortega stated Grandmother was not going to be approved and, therefore, if the court proceeded with the adoption without SSA joining, then Grandmother would not be eligible for adoption assistance program funding. Ortega believed that funding would be important for Grandmother to care for David.

B. *Grandmother's Testimony*

Grandmother testified she was David's primary caregiver for the first four months of his life. For the two years David was in the dependency system, Grandmother did not seek custody because she was having back and shoulder problems, making it difficult to pick up and carry him. She admitted telling the social worker David should be adopted. Grandmother stated she also hoped Mother would be reunited with David.

Grandmother claimed SSA never said she needed prior approval for a roommate. Thea moved in on October 1, 2012, and Grandmother claimed she told Ortega about Thea during one of her visits in October or November. Ortega simply required Thea have a Live Scan, which she did. Grandmother said she first learned there was a problem with Thea on April 4, when David was removed.

Grandmother said she had known Thea for about two months before she became a roommate, and Thea was close friends with Mother. Grandmother invited Thea to move in because she was in a difficult situation and she did not believe David's health

13

and safety would be at risk. Grandmother did not believe Thea was kicked out of her transitional living home due to repeatedly calling the ambulance, but rather it was because they would not let her have a service dog. She stated that even if Thea had been kicked out, David was not at risk because Thea was not his primary caregiver. Grandmother stated Thea took medications to address her mental health problems, and she never exhibited any concerning behavior. Moreover, Grandmother understood Thea's MRSA was dormant and the disease was not contagious. Thea's last outbreak was in 2007, and because Grandmother took Thea to all her doctor's appointments, she learned from the doctor that Thea was not contagious. Grandmother stated she was trained as a physical therapist, and she took extra precautions to protect Thea (because her immune system was weak) such as washing their hands frequently, doing laundry separately, using the dishwasher, and keeping David away from Thea's bedding and belongings.

Grandmother testified Thea had small sores on her body and she would pick at acne on her face, neck, and arms. She rarely left David alone with Thea, and if she did, it would only be for a few minutes. Thea only "minimally" helped with childcare and occasionally she told David not to do things, such as stay away from her bed.

Grandmother stated she understood why the court had concerns about choice of roommates. She stated Thea was no longer living there, and she did not intend to have another roommate. She was able to support herself without the rent money. She stated she did not need the foster care money for her basic needs and she denied supporting Mother financially.

When questioned about why it took so long to complete the adoption paperwork, Grandmother stated she was busy with David but really she did not "have a good excuse." With respect to her psychiatrist, Grandmother stated he had a really hard name to pronounce and she just called him "Dr. G." Grandmother testified she had been

14

under the care of a psychiatrist for about 13 or 14 years, and had been treated by her current psychiatrist for about six to nine months. She admitted she did not tell anyone at SSA about her psychiatric care before David was placed in her custody because nobody asked her. At the hearing, when asked if she now knew the name of her psychiatrist, she stated "I can't pronounce it, but I have it written." She had not yet given the name to anyone at SSA. She claimed the psychiatrist prescribed for her an antidepressant, Effexor, and she assumed it was to help facilitate her pain medications. She said her pain symptoms would come and go, but had been better in the last six months. She admitted currently taking MS-Contin (an opiate), muscle relaxers, and medicines for her sinuses and shoulder problems. She asserted the medications helped her function better and she felt able to appropriately take care of David.

Grandmother discussed David's speech and motor deficits, and explained she was waiting to hear back from the school district regarding her application for speech and occupational therapy services. Grandmother testified she also facilitated contact with Mother because the first social worker assigned to the case thought it was a good idea for David. Grandmother stated she supervised all contact with Mother, and she did not believe Mother posed any danger to David. Mother visited two to three times per week. Grandmother admitted she let Mother spend the night a few times and had not cleared the overnight visits with Ortega.

When questioned about the negative personal reference, Grandmother testified she had not seen her sister for over a year. They parted ways after living together for six months during a rough time in Grandmother's life. Grandmother said her sister had never seen her interact with or care for David.

Grandmother also discussed the strong bond she and David shared. When David was removed from her care, he wanted Grandmother to go with him. She said they had one visit since his removal. He said David was glad to see her and when she put him in the caretaker's car at the end of the visit, David started to cry. Grandmother stated she

15

loved David very much and she could provide a good stable home for him. Grandmother had no doubt David loved her because he was very affectionate with her, and often asked her to hold him.

*C. Social Worker Martin's Testimony*

Martin has been a social worker for over 14 years. She restated much of the information contained in the reports. She added that during her first interview with Grandmother, she learned Grandmother had been diagnosed with "major depression and was prescribed Effexor and Abilify." When Martin questioned Grandmother why she was taking both, Grandmother replied the Effexor was not having a therapeutic effect and the doctor added Abilify to help with her symptoms of crying and some suicidal ideation. Martin said she was concerned these medications in addition to the muscle relaxers and MS-Contin would be sedating and mild altering. Because of these concerns, Martin consistently asked Grandmother to submit a medical report and provide the name of her psychologist. Martin sent her three reports to fill out because Grandmother said she kept losing them.

Martin testified that several months after Mother's parental rights were terminated, Grandmother stated she permitted Mother to visit David every day. Grandmother explained they usually went to the park or McDonald's because Mother liked the structure of going to the same place. Grandmother told Martin she helped Mother financially and Mother was no longer using drugs. Martin recalled that in November 2012, she discussed with Grandmother the need for separation from Mother and David needed time to bond in his new placement with Grandmother.

Martin stated that in March 2013, Grandmother said she was making Mother drug test before visiting David. Grandmother commented Thea had Mother "on a tight string regarding that" and they had restricted some visits. However, Martin noted Thea also appeared to be medicated, and Martin was concerned about her mental health. Martin saw several open sores on Thea's body and one looked red and infected. Thea

16

stated she picked at herself as a manifestation of her obsessive compulsive disorder (OCD).

Martin also stated that when David was removed from Grandmother's home in April 2013, he was "filthy dirty." She said "his hands were caked with dirt. He had black under his fingernails. His hair was dirty and matted and smelled. He smelled like he had a dirty diaper. I checked his diaper. It was not dirty. He needed a bath."

Martin opined Grandmother's home study would not be approved. Martin stated she was concerned about Grandmother's poor judgment in allowing Thea to stay at the house in the middle of the home study and giving Mother so much access to David when the goal was now adoption. She noted Grandmother's priorities appeared to be taking Thea to all her doctor's appointments rather than working on giving the necessary documents for David's adoption. Martin referred to the negative reference from Grandmother's sister and evidence suggesting Grandmother relied on Thea and Mother to help her care for David.

Martin testified David was adjusting to his current placement. For a few days he was "tantruming" over 10 times a day, but now he had the normal amount of tantrums for a three year old.

The court ruled removal from Grandmother's care was in David's best interests. It noted that based on the reports and testimony, SSA "clearly, dropped the ball in this case. There were multiple red flags of problems with this particular placement." It noted Grandmother failed to: (1) provide the necessary documentation for adoption, including information about her psychiatric issues; (2) she did not disclose the relevant information about her roommate to SSA; (3) she permitted extensive contact with David's drug addicted mother; and (4) she delayed getting help for David's developmental issues. The court recognized Grandmother and David shared a strong bond and it was reluctant to make David change placements again. Nevertheless, the court concluded the evidence did not support the finding placement with Grandmother

17

was in David's best interests. It ordered Grandmother should receive two hour visits twice a month and referred her to Consortium to mediate for post-adoptive contact.

II

"Once a dependent child is freed for adoption, the [Agency] to which the child is referred for adoption is responsible for the child's custody and supervision. The [Agency] is entitled to the exclusive care and control of the child at all times until a petition for adoption is granted. [Citations.]" (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71 (*Shirley K*).) SSA has discretion to terminate an interim or adoptive placement at any time before the petition for adoption is granted. (*Ibid*.)

SSA's discretion concerning adoptive placement "is not unfettered." (*Shirley K., supra,* 140 Cal.App.4th at p. 72.) The juvenile court retains jurisdiction over the child, among other things, to ensure that adoption is completed as expeditiously as possible and to ascertain the appropriateness of the placement. (*Ibid.*) Pursuant to section 366.26, subdivision (n), the court is also empowered to review SSA's decision to remove a child from a prospective adoptive parent. (§ 366.26, subd. (n)(3).)

Section 366.26, subdivision (n), provides in relevant part that at the hearing to determine whether the child shall be removed from the custody of a prospective adoptive parent, "the court shall determine whether the caretaker has met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1), and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B).)

We review a court's decision to terminate a placement for abuse of discretion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171 [abuse of discretion used in reviewing whether removal of child from home in child's best interest]; see also *In re C.B.* (2010) 190 Cal.App.4th 102, 123, fn. 5 [abuse of discretion used in child custody

18

situations].)  We must give the juvenile court's decision ""'"[b]road deference"'"" and view the evidence in the light most favorable to the court's decision.  (*In re Levi H.* (2011) 197 Cal.App.4th 1279, 1291.)  We do not substitute our judgment for that of the trial court and cannot reverse ""'"unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination [citations].'"  [Citations.]"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

It is undisputed Grandmother was originally designated as the prospective adoptive parent for David (§ 366.26, subd. (n)(1)), and that she and David share a close bond.  Grandmother challenges SSA's argument she exercised poor judgment or had boundary issues with Mother as not being supported by the record.  To the contrary, she points to evidence suggesting the social workers approved of her roommate and the monitored visits with Mother.  In addition, she maintains a home study is not required for adoptive placement, and the court failed to adequately consider the negative emotional turmoil a change in custody will have on David.  She raises some valid points about SSA's actions in this case.  However, we conclude the record supports the juvenile court's conclusion that it was in the David's best interest to be removed from Grandmother.

We begin by noting the juvenile court's statements, made on the record before ruling on the motion, contain an excellent summary of the state of the evidence, the effect of SSA's failings, and why ultimately the difficult decision to change David's placement is in his best interests.  The record also plainly shows the court was not impressed with many of SSA's arguments, including the ones Grandmother now challenges in her writ petition.

For example, the court expressed frustration with SSA's argument Grandmother showed poor judgment in allowing Thea to become a roommate.  It stated, "How poor could that judgment be if [SSA] went along with it?"  And, "I'm having a real hard time with this idea that this shows poor judgment on [Grandmother's] part when

19

[SSA] knew that [Thea] was there, had every reason to look into her background to find out whether or not she's appropriate and basically, tells [Grandmother] it's okay for [Thea] to be there, and then, you know, complains about her lack of judgment when [SSA] finally does their due diligence and . . . find[s] out some of the problems that the roommate has."

The juvenile court also rejected SSA's argument Grandmother should not have permitted visits with David's drug addicted mother. The court noted SSA knew about the visits and Martin testified she knew Mother was visiting on a daily basis, for three hours a day. The court stated, "How much of this is something where if you folks had merely said to [Grandmother], listen, I think there's some boundary issues here. You, really, need to cut back on this because this isn't going to be good for the child. We have no way of knowing whether or not things would be any better now if you didn't have this tacit approval of [SSA] every step of the way."

Consequently, Grandmother's attack focused on these same arguments in her petition cannot serve as grounds for reversal. In short, because these arguments were not the basis of the court's ruling, they obviously cannot serve as grounds for ruling the court abused its discretion.[2]

We conclude the trial court properly focused on other evidence supporting the finding removal from Grandmother's home was in David's best interests. For example, the court stated it found relevant the undisputed fact Grandmother was not "forthcoming with [SSA] about all the issues involving the roommate" and the court determined Grandmother was "untruthful about the roommate in her testimony [at the hearing]."

---

[2]     For this same reason, we need not address Grandmother's contention the lack of a home study would not prevent the court from finalizing Grandmother's adoption of David. This argument was raised by SSA below. The court did not mention it or rely upon it when making its ruling.

20

It gave as one example all the different stories Grandmother offered about why Thea's MRSA would not endanger David. The court noted, first Grandmother claimed the MRSA was not contagious. When counsel stated the disease was problematic, Grandmother testified the household used all sorts of special protocols to make sure the disease would not spread. And when this testimony suggested Grandmother knew there was a problem with MRSA, Grandmother attempted to clarify the precautions were taken to protect Thea, not David from infection. The court concluded, "It can't go all those ways . . . she's not being truthful here."

In addition, the court determined Grandmother was not being truthful about her own mental health status, stating, "She, clearly, wasn't truthful here when she claimed that the psychiatrist . . . never told her what her diagnosis was because she told . . . Martin . . . back in November, that she was suffering from major depression and that she was getting medication from the doctor for that, and then she comes in here and testifies that she isn't?" The court also found it very telling that Grandmother did not timely provide the required information to the social worker needed to complete the adoption. "She wants us to believe that from November until . . . this very day she's been unable to present that information to [SSA]? If she's not being honest and forthright, if she's not providing the information, how can [SSA] make an appropriate determination?"

The juvenile court agreed with minor's counsel's assessment it was "appall[ing]" how the case was handled by SSA. Minor's counsel stated she was uncertain why David was placed with Grandmother in the first place. Counsel speculated that because Grandmother got a roommate within a few months and orchestrated daily visits with Mother, "it seems pretty obvious she's not taking care of [David] full time." Minor's counsel also pointed out SSA did not need to tell Grandmother not to move into a one bedroom apartment with "a stranger who's a friend of your daughter who has mental health problems and substance abuse problems[.]" Minor's counsel suggested the

21

only reason Grandmother would allow Thea to sleep in the middle of the room is because she could not take care of David by herself.

Minor's counsel was alarmed so much medication was within David's reach at the house, and by the fact Grandmother permitted unauthorized overnight visits with Mother after her rights were terminated because Mother's presence would give him uncertainty. Counsel was also concerned to learn about David's disheveled unkempt condition when he was removed from Grandmother's custody. The court agreed with counsel's observation, stating it was unclear why the social workers never made an *unscheduled* visit at anytime, especially given the questionable roommate situation.

The court made the following apt observations before making its ruling. The court began by stating it had read the reports and considered the testimony and "[i]t's clear from the record, it appears to the court that [SSA], clearly, dropped the ball in this case. There were multiple, multiple red flags of problems with the particular placement. I can only speculate as to whether or not [SSA] had provided timely guidance to [Grandmother] whether or not that would have made a difference, but I can indicate from the evidence that I have that her other things, the attempted guidance didn't seem to help." The court gave as examples evidence Grandmother ignored Martin's advisement that the level of contact between David and Mother was not appropriate. She also ignored the social worker's multiple requests to provide the appropriate documentation so that they could proceed with the adoption. The court noted, '[I]t was made abundantly clear that you [Grandmother,] needed to provide the information regarding your psychiatric issues and that that should have been done way back in November." The court noted that after several months had gone by without getting the information, the social worker should have suspected "something" or that perhaps Grandmother was hiding relevant information.

22

The trial court stated it was "concerned that while [SSA] knew that the roommate was there after [she] had been there for some time, that . . . [Grandmother] didn't provide [SSA] with all of the relevant information about that roommate and it wasn't until later that it was discovered . . . there were major issues with respect to this particular roommate." The court added that if the court assumed there were no problems with the roommate, Grandmother showed questionable judgment in permitting a "complete stranger into [her] home with [her] infant or toddler child to live in a one-bedroom apartment." Being a good neighbor must "be tempered somewhat with what's best for [David] . . . under your care."

The court stated that in this case there are multiple problems with the roommate and Grandmother knew why Thea could not find another place to live. Grandmother should have realized on her own that if SSA was interested in her psychiatric issues, it also would be interested in the mental health of her roommate. The court held, "it was incumbent upon [Grandmother] to give the information that was relevant and pertinent . . . to [SSA] so that they [could] properly vet this person that was living in [her] home. And clearly [she] should have done that. I mean, this is somebody [she] hardly even knew."

As for Grandmother facilitating frequent contact between Mother and David, the court noted SSA was not aware of it until Martin found out. Grandmother's excuse that a pervious social worker encouraged some contact is not compelling because Grandmother arranged for three hours of daily contact with a drug addicted person. The court concluded, "Clearly, there is a divided loyalty here. . . . [Grandmother's] concerned about the roommate. She's concerned about her daughter and she wants to take care of them and save them and do all of the things that she needs to do for them, but in the meantime, we've got a child that's in the middle of this who's placed at risk . . . ."

23

The court did not find credible Grandmother's claim she did not know MRSA was going to be a problem. It stated, "The action and conduct that you took is clear that you knew that this was a problem and yet you still expose this . . . little boy to this . . . environment with these problems and place the child at risk of contracting that disorder." The court was also concerned Grandmother was "just now getting around to looking at addressing [David's] . . . developmental issues." It stated, "you should have been dealing with [this issue] all along . . . ."

The court concluded it had "no doubt" there is a loving and affectionate bond between David and Grandmother, but it was required to do what is in David's best interests. It explained there was no way to "organize the evidence that I have before me in a way that would support" keeping David placed with Grandmother. The court recognized David had endured many foster care placements and causing the trauma of another change should only be done as a last resort. It noted there was evidence David was upset by the removal, and it was reported he was tantruming. "But we've got a situation where we've been trying to move toward adoption . . . since May, that's almost a year that they've been trying to get [Grandmother] to move forward." The court noted not only was Grandmother too busy to find the time to adopt David, she also "made choices and decisions and maintained her home in a way that just was not suitable or appropriate for the child. That is contrary to the child's interests."

In summary, the juvenile court properly focused on the evidence establishing Grandmother showed an extreme lack of judgment by keeping important information away from SSA and that she was not a credible witness with respect to her efforts to keep David safe. It is undisputed Grandmother was not forthcoming about her own psychiatric issues and certainly held back relevant information about the many potential risks posed by her roommate. Grandmother also failed to disclose Mother was having monitored overnight visits. These poor choices directly interfered with SSA's ability to conduct the home study and investigate David's prospective adoptive

24

placement. It was certainly not in David's best interests for Grandmother to delay his adoption for nine months.

Moreover, the record refutes Grandmother's claim she did not know she had done anything wrong because SSA "never told her." As noted by the juvenile court, Grandmother was told to limit contact with Mother because that was in David's best interests, but she did not. She was also repeatedly asked to turn in the necessary documentation, including medical histories, but she failed to timely disclose this relevant information. It is difficult to fathom why one would ignore the social workers' requests for documentation if one truly wished to complete the adoption process. Moreover, when questioned about her conduct, Grandmother asserted she did not know the information was relevant because *she believed* David was never in danger or at risk of injury or disease. The evidence supports the court's assessment Grandmother was not a credible witness in this respect; she understood the potential risks to David, but nevertheless kept the relevant information hidden from SSA.[3]

Grandmother asserts the issues regarding Thea were completely "mitigated" by the fact they no longer lived together. Not so. It is true Grandmother's home no longer holds the same risk of David, (1) contacting MRSA, or (2) being

---

[3]     This conclusion also answers Grandmother's claim there is no evidence visits with Mother caused David harm or put him at risk of harm. Because Grandmother did not disclose Mother was having overnight visits, the potential risks could not be properly assessed. Moreover, once the social worker was notified about daily visits with Mother, Grandmother was advised to discontinue these visits, but she ignored this admonishment. There was also evidence contact with Mother put David at risk of harm. Grandmother admitted she required Mother to drug test, and the record is full of information linking Mother's drug usage to violent and aggressive behavior. In the past she was arrested for assaulting Grandmother. Her visits with David must be monitored. Grandmother supplies no evidence to support her argument having daily contact with a drug addicted relative with mental health issues, would be in David's best interests. Grandmother's contention she would have no restrictions on who visited David after she adopted him only further supports the court's assessment of her suspect judgment.

emotionally or physically harmed while in the care of a highly medicated and mentally ill roommate. We conclude, however, the court correctly assessed Grandmother possessed bad judgment when it came to assessing a toddler's best interests and this conclusion is not mitigated by removal of the roommate.[4] Other than Grandmother's self-serving testimony, there is little reason to hope Grandmother would think twice before allowing another high-risk person into her life and home. Her failure to see any potential issues on her own, without SSA's guidance, with respect to David having contact with persons having drug addictions, mental health issues, and potentially contagious diseases is troublesome and cannot be ignored. Grandmother, who was fully aware of her own physical limitations and severe depression, her daughter's critical shortcomings, and her roommate's serious medical and mental issues, should have been more forthcoming with information to SSA due to the obvious safety risks to David. Her lack of cooperation and delays supports the trial court's assessment placement with Grandmother was not in David's best interests

We agree with the juvenile court's assessment that if Grandmother's priorities had truly been focused on David's best interests, she would have timely collected and submitted the requested information necessary for adoption. While David was waiting for a permanent home, Thea was taken to all her medical appointments and Mother enjoyed playtime with David each day at McDonalds or the park. We agree with the court that in light of Grandmother's divided loyalties to help Mother and Thea, David's removal from her home was in his best interests.

---

[4] There is additional evidence supporting this determination. Grandmother never offered to care for David during the two years he was bounced between five different foster families during the dependency proceedings. And she did not call the authorities when Mother left David as a newborn with inappropriate caretakers, despite claiming to be "gravely concerned" and knowing they were feeding the four month old baby Kool Aid.

26

And finally, contrary to Grandmother's contention, the record reflects the juvenile court took into consideration David's strong emotional bond with her. It acknowledged David was negatively and emotionally affected by his removal from her care and the court was reluctant to move him, saying it would have to be "a last resort." We cannot say the court abused its discretion in concluding the circumstances of this case require the option of last resort. The emotional impact caused by his removal was outweighed by Grandmother's insufficient level of care and David's best interests in finally being adopted.

III

The petition is denied.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.